[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, the Town of Southington, has brought two administrative appeals from actions taken by the State Traffic Commission (hereinafter the "STC") with respect to the operation of the Lake Compounce Festival Park located partly in Bristol, and partly in Southington. The first appeal (Dk. No. 36 28 40), filed June 9, 1989, concerns the issuance by the STC of Certificate 606-A permitting the operation of the Park subject to certain specified conditions; the second appeal (Dk. No. 36 75 74), filed September 22, 1989, pertains to the administrative decision of STC's Executive Director authorizing construction of a reserved seating facility and roof. The two appeals were consolidated for trial by order of the court dated November 9, 1989.
A review of the lengthy administrative record discloses the following facts. In 1986, the Park, then known as Hershey-Lake Compounce Amusement Park, was operated by a subsidiary of the Hershey Corporation, Hershey, Pennsylvania, as a general partner of Compounce Associates Limited Partnership. On or about June 18, 1986, the STC, acting pursuant to General Statutes Section 14-311,[1] issued Certificate 606 to Compounce Associates; the Certificate ordered compliance with a number of conditions and requirements, including interim conditions that the Park be limited to the operation of 9500 entertainment units per hour until all certificate requirements were satisfied, that a number of improvements be made and installed on Route 229 and other arteries leading to the Park entrance to accommodate the full development of the facility, and that the developer furnish CT Page 852 the STC with monthly traffic data (hourly counts of vehicles entering the facility) until such time as all of the certificate requirements were satisfied.[2]
Hershey/Compounce Associates operated the Park during the summers of 1986 and 1987; in 1988, the STC was advised that all of the requirements of Certificate 606 had not been fulfilled, that "attendance and traffic projections had fallen far short of the original projections", and that Hershey Corporation had "abandoned the park in the fall of 1987."[3] In April 1988, the STC was informed that the Joseph Entertainment Company, of Milwaukee, was the new owner of the Park and it was requested that the existing Certificate 606 be modified to permit the facility to operate during the summers of 1988 and 1989 without further roadway improvements since the projected attendance and traffic projections remained highly speculative. The Joseph Entertainment Company management (hereinafter "Compounce") stated it would conduct a comprehensive traffic engineering study and would work with STC staff to resolve any safety and capacity problems arising with respect to the Park's continued operation.
On June 2, 1988, the STC approved Compounce's request to temporarily operate the Park under Certificate 606 without full compliance with the remaining conditions, provided certain other specified conditions were satisfied; one such condition was that Compounce furnish "a comprehensive traffic engineering study, including actual traffic volumes, upon the completion of the 1988 season and prior to December 1, 1988."[4] The STC also rescinded Condition No. 7 of the original Certificate which contained the time limitations within which certain roadway improvements, etc. were to be initiated by the developer.
In June 1988, Compounce indicated that the Park had not reached the 9500 entertainment unit limit of Interim Condition #6, and that it was not anticipated that such level would be exceeded during the 1988 season. However, during the 1988 season, the new owner and management (Joseph/Compounce) began conducting outdoor musical concerts in conjunction with the normal amusement activities of the Park; while the Park maintained operations in 1988 from late May through the end of September, the outdoor concerts did not commence until July, continuing throughout the remainder of the season. During the 1988 season, the concerts were held primarily on Friday, Saturday, and Sunday evenings. Following the 1988 season, the STC was advised that it was the intent of Compounce to continue the outdoor concerts as part of the Park's normal activities during future seasons.
On or about January 27, 1989, Compounce furnished the CT Page 853 STC with the detailed and comprehensive Bubaris Traffic Engineering Study, as per the June 2, 1988 condition. In the Bubaris report, reference was made to the STC interim condition under Certificate 606 that the Park be limited to 9500 entertainment units per hour until such time as it could be demonstrated that a higher usage could be handled adequately by the surrounding roadway and traffic control network; Bubaris urged the actual attendance at the Park as a "more effective measure of the Park's traffic impact" and, therefore, analyzed traffic problems in terms of attendance figures, either actual for the 1988 season, or projected for the 1989 season. The Bubaris report indicated that after consultation with DOT, it was determined that the impact of the outdoor concerts on traffic conditions should be evaluated on both a Friday and a Saturday evening. The report states:
 "The Friday evening analysis was intended to provide a basis for evaluating the impact during a time when concert traffic coincided with a typical background commuter peak. The Saturday evening analysis was intended to provide a basis for evaluating the impact of what could be expected to be a higher attended concert combined with typical background volumes associated with a Saturday evening in the study area."
Traffic count measurements determined actual volumes on the surrounding roadway network during the period when traffic was travelling to a concert; no "direct measurements" were taken when concert traffic was leaving, or travelling away from the Park. In this regard, the report stated: "The rationale for measuring only inbound traffic is that background traffic volumes are higher during concert inbound periods and, therefore, represent a higher combined traffic condition . . . [and] actual experience with concerts occurring earlier in the season indicated that the inbound period represented a more difficult traffic condition than did the outbound period."
Under cover letter dated March 3, 1989, Bubaris submitted, on behalf of Compounce, an application for a Certificate to allow the scheduling of concerts at the Park; the cover letter stated that the application, together with additional data, was submitted at the request of the STC. At its meeting on April 18, 1989, the STC discussed Compounce's application, and all those who opposed the issuance of the Certificate, including counsel representing the Town of Southington, were permitted to address the Commission.[5] The minutes of the April 18 meeting disclose that the Town Planner CT Page 854 (Southington) also addressed the STC expressing "concern for the widening of West Street [Route 229] and the adequacy of the roadway system to handle Lake Compounce concert traffic," as well as concern "for future development along West Street." The traffic impact study prepared by Storch Engineers was presented to the STC by the Town, and the Town Counsel requested a continuance in order to conduct an additional independent traffic study; no action was taken on Compounce's application and it was "agreed to reschedule consideration of this application in two weeks."
Following the April 18 STC meeting, the Town of Southington submitted (on April 27, 1989) a Petition To Be Made A Party In Interest, a Petition To Intervene, and a Verified Pleading of Intervention under General Statutes Section 22a-19. The STC responded on April 28 denying Southington party and intervenor status, but notified the Town that Compounce's application would next be considered by the Commission on May 4, 1989 at which time Southington could speak in further opposition to the application, and/or submit any additional data.
At the STC meeting on May 4, 1989, those opposed to the issuance of a Certificate were again permitted to address the Commission. Comments were made on the 1985 Storch report, and an updated traffic analysis was presented by a representative of that engineering firm. Concerns were again voiced regarding the projected levels of service, exiting traffic and its effect, and the capability for adequately monitoring future concern attendance. Southington's Town Planner advised the Commission that the parking lot expansion as proposed in the applicant's Plans had not received approval from Planning and Zoning. The Southington Town Manager requested that the STC postpone action on the application for forty-five days to allow a more specific determination of what improvements would be required; attorneys representing local residents urged the desirability of controlling the level of concert attendance; and, Town Counsel for Southington called for the widening of Route 229 and a postponement of the STC decision pending Town Planning and Zoning approval. The minutes of the May 4 meeting state that the Commission discussed the possibility of future amendments to the Certificate, the capability of the existing roadways to clear out traffic citing the Park, and the requirement that Compounce continue to monitor traffic levels entering the Park. Further, in response to concerns expressed by officials of the Town of Southington, the Commission also agreed to require the monitoring of traffic exiting the Park. On May 4, 1989, the STC voted unanimously to issue the revised Certificate (Certificate No. 606-A, subject to the "approval of the development by the Southington Planning and Zoning Commission", and subject to a number of conditions and CT Page 855 requirements. Certificate NO. 606-A appears as a modification of Certificate No. 606; No. 606A was issued "for the operation of the Park as it currently exists", which included amusement facilities "providing 8825 entertaining units per hour and two staging areas which serve various outdoor concerts, plus the addition of a creative play area providing 200 entertainment units per hour." It was specifically recited that the revised Certificate 606-A did "not include the construction of the much publicized amphitheater", and did not "include any expansion of the amusement facilities except the addition of a creative play area." The STC Report stated: "Any expansion of the Park will require review and approval by the State Traffic Commission." Further, under 606-A, the Park was "expected to have 6,737 parking spaces;" thus, No. 606A was issued "contingent upon [Compounce] obtaining approval of additional parking spaces by Southington Planning and Zoning."[6]
On May 26, 1989, Compounce was advised that in the event it failed to obtain the additional parking approval from the Southington Planning Zoning, the STC would reconsider Certificate 606-A. On July 5, 1989, the Southington Planning and Zoning Commission voted to deny Compounce approval for the proposed development of an expanded parking area. As a result of that action, Compounce submitted to the STC alternative parking plans utilizing the parking areas of industrial concerns with shuttle service to the Park; the alternative parking plans provided for a total parking capacity of 5944 vehicles, approximately 300 more parking spaces than Compounce's traffic engineer had stated would be necessary for the "highest anticipated attendance". The alternative additional parking plans involved locations in Bristol and, therefore, did not require Planning Zoning approval by the Town of Southington.[7]
The alternative parking proposal was referred to, and thoroughly investigated by, the Office of Traffic Engineering, Bureau of Highways; it was concluded, in a report submitted in August, 1989, that "[t]he redistribution of traffic from on-site parking to the proposed off-site parking will not have a significant impact on the roadway system in the area."
While the STC was studying the alternative parking proposal, a request was made by Compounce for approval of "6000 more reserved seats" to the "temporary" entertainment facility, the constructing of a roof over a portion of the reserve seating, and the "terracing of the hill" for a better view of the concert stage. Regarding this proposal, Compounce wrote the STC: "It is our belief that this plan does not need a full review of [the STC] as this is not a new operation, a new location, or a new facility; rather, it is for renovations on an existing facility." Compounce's request was approved by the STC'S Executive Director (Mr. William W. Stockert) on August 14, CT Page 856 1989, without submission at any meeting of the STC; the letter of approval read:
 "This office has reviewed the recent correspondence and plans regarding the installation of additional reserved seats and the construction of a roof over these seats.
 "As this activity will occur within the area previously reviewed and will not affect the approved traffic generation, additional approvals by the State Traffic Commission will not be required."
The Executive Director's approval was confirmed and clarified by Commissioner William Burns on August 21, 1989 in a letter directed to Compounce's management; the Burns letter stated that the administrative decision approving the reserved seating (and roof) proposal did not constitute an expansion requiring a new Certificate and was "based on information and plans which reflected that the reserved seating under cover, the reserved seating not under cover, and grass area seating, would occur within the concert area previously approved and would not increase the seating and/or the attendance capacity", and also, that "it [was] anticipated that the approved traffic volume generation would not be affected." Commissioner Burns' letter continued: "It is imperative that all parties understand that any revisions to these plans which may result in increases to the capacity of the facility and/or to traffic generation requires [STC] approval" which must be "obtained prior to the issuing of any building permits."[8]
As stated heretofore, Southington has appealed from the May 4, 1989 issuance of Certificate No. 606-A (Dk. No. 362840), and from the August 14, 1989 administrative approval regarding additional reserve seats and roof construction (Dk. No. 367574). On September 12, 1989, all parties were notified that Compounce's alternative parking proposal, together with Traffic Engineering's recommendation that such proposal be approved, would be presented to the STC at its meeting to be held on September 27, 1989. On the latter date, at said meeting, the STC revised Certificate No. 606-A, allowing the alternative parking plans submitted by Compounce. AlI parties were notified of the action taken by STC in a letter dated October 3, 1989; no appeal was taken from the September 27, 1989 revision of Certificate 606-A.
In these consolidated appeals, plaintiff, the Town of Southington, maintains that the actions of the STC were illegal, CT Page 857 capricious, and arbitrary for the following reasons: (a) plaintiff was denied party and/or intervenor status; (b) the STC approved Certificate 606-A when the terms and conditions of the prior Certificate had not been met; (c) approval of Certificate 606-A results in "interference with the needs for highway purposes", interferes with DOT operation, creates traffic hazards, and interferes with the safe and free flow of traffic, all in violation of the STC's statutory and regulatory requirements; and, (d) the STC failed to maintain a stenographic record or recording of its proceedings.[9] Other grounds asserted by plaintiff relate primarily to the August 14, 1989 administrative action taken with regard to the reserve seat and roof construction: (e) the administrative action violated the express term of Certificate 606A providing that the revision of the original 606 did not include the construction "of the much publicized amphitheater", and that any expansion of the Park required further review and approval by the STC; (f) the action taken by the Executive Director, and ratified by Chairman Burns, violated the statutory mandate of Section 14-311 in that the STC failed to conduct a full review of the proposal; and, (g) the STC acted illegally and improperly in allowing Compounce to "expand" absent full compliance with the requirements and conditions of the prior Certificate.[10]
1. Standard of Review
General Statutes Section 14-311(e) provides for an appeal from a decision of the STC "in accordance with the provisions of section 4-183 [Administrative Procedure Act]." Under the UAPA, and the case-law precedents, the standard of review in an appeal from the decision of an administrative agency is exceedingly restricted. Section 4-183(g) specifically mandates that the court shall not "substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." The trial court is not to retry the case, and an agency's factual and discretionary determinations are to be accorded considerable weight. State Medical Society v. Board of Examiners in Podiatry, 208 Conn. 709, 717 (1988). It is not the function of the court to retry the case, de novo, and the review is limited to the record of the proceedings before the agency. Lawrence v. Kozlowski, Commissioner of Motor Vehicles, 171 Conn. 705,707-08 (1976); General Statutes Section 4-183(f). The reviewing court should uphold the administrative decision if it is reasonably supported by the record. Madow v. Muzio,176 Conn. 374, 376 (1978); Williams v. Liquor Control Commission,175 Conn. 409, 414 (1978). It is fundamental that the party bringing an administrative appeal bears the burden of proof in challenging the administrative action. Lovejoy v. Water Resources Commission, 165 Conn. 224, 229 (1973). CT Page 858
General Statutes Section 4-183(g) provides: "[t]he court may reverse the decision of the agency if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." The question on an appeal of an administrative determination is "not whether the trial court would have reached the same conclusions but whether the record before the [agency] supports the action taken." Board of Education v. Freedom of Information Commission,208 Conn. 442, 452 (1988); Harrison v. Commissioner, 204 Conn. 672,680 (1987); Griffin Hospital v. Comm. on Hospitals and Health Care, 200 Conn. 489, 496 (1986); Hospital of St. Raphael v. Commission on Hospitals Health Care, 182 Conn. 314, 318
(1980). Generally, it is the reviewing court's "ultimate duty" simply to decide whether, on the basis of the whole record, the administrative determination was unreasonable, arbitrary, illegal, or an abuse of agency discretion. Cos Cob Volunteer Fire Co. No. 1 v. FOIC, 212 Conn. 100, 104 (1989); New Haven v. Freedom of Information Commission, 205 Conn. 767, 774 (1988); Bukley v. Muzio, 200 Conn. 1, 3 (1986). Courts normally accord considerable deference to the construction given a particular statute by the agency charged with its enforcement. Griffin Hospital v. Comm. on Hospitals Health Care, supra at p. 496-97; Connecticut Light Power Co. v. Public Utilities Control Authority, 176 Conn. 191, 198 (1978); Anderson v. Ludgin, 175 Conn. 545, 555-56 (1978); Ierardi v. Commission on Human Rights and Opportunities, 15 Conn. App. 569, 574 (1988). If the record established supports the conclusion of the administrative agency, the court must affirm the agency decision. Howell v. Administrator, Unemployment Compensation Act, 174 Conn. 529, 533 (1978); Hart Twin Volvo v. Commissioner of Motor Vehicles, 165 Conn. 42, 49 (1973); Demma v. Commissioner of Motor Vehicles, 165 Conn. 15, 17 (1973).
II. Jurisdiction
A statutory right of appeal may be exercised only through strict compliance with the statutory provisions which have created that right. Tarnopol v. Connecticut Siting Council, 212 Conn. 157, 163-64 (1989). Since the appeal provisions of the UAPA are jurisdictional in nature, a failure of compliance renders the appeal subject to dismissal for want of jurisdiction. Id. at p. 163. CT Page 859
a) Aggrievement
General Statutes Section 14-311(e) states that [a]ny person aggrieved by any decision of the [STC] may appeal therefrom in accordance with the provisions of section 4-183." (Emphasis added). Section 4-183 (pre-1989) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review by way of appeal under this chapter . . ." (Emphasis added).
Aggrievement is a jurisdictional issue which presents a question of fact for the trial court; proof of aggrievement is a prerequisite to the court's jurisdiction over the subject matter of the administrative appeal. Bakelaar v. West Haven,193 Conn. 59, 65 (1984); Hartford Distributors, Inc. v. Liquor Control Commission, 177 Conn. 616, 622 (1979); Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 493 (1978); Beckish v. Manafort, 175 Conn. 415, 419 (1978); Nader v. Altermatt,166 Conn. 43, 59 (1974). A two-prong test has been established for the determination of aggrievement: (1) the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the administrative decision, as distinguished from a general interest, such as the concern of the community as a whole; and, (2) that party must establish that his specific, personal and legal interest was specially and injuriously affected by the decision. Zoning Board of Appeals v. Freedom of Information Commission, 198 Conn. 498,502 (1986); Bakelaar v. West Hartford, supra; Hall, et al v. Planning Commission of Ledyard, 181 Conn. 442, 444 (1980); Mystic Marinelife Aquarium, Inc. v. Gill, supra; Nader v. Altermatt, supra at p. 51. Aggrievement will be established if there is a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected by the administrative action. State Medical Society v. Board of Examiners in Podiatry, 203 Conn. 295, 300 (1987); Hall et al v. Planning Commission of Ledyard, supra at p. 445; Glendenning v. Conservation Commission, 12 Conn. App. 47, 53 (1987).
b) Additional Evidence
As stated, aggrievement is a jurisdictional fact, and the factual issue must be resolved before the appeal can be considered on its merits. Hartford Distributors, Inc. v. Liquor Control Commission, supra. Without objection, the court received certain additional evidence solely on the issue of aggrievement.[11] Testimony of the Chief of Police, Town of Southington, confirmed, and expanded upon, facts set forth, for the most part, in the administrative record returned to court; this testimony substantiated the following facts: (a) Route CT Page 860 229 (also named "West Street") is a State Highway running generally north and south; it is a "major artery", runs parallel to Queen Street, and is heavily traveled, particularly at commuter hours; (b) the most commonly traveled roadway to the Park is from Exit 30 off I-84, taking Route 229/West Street north for approximately 2.2 miles to Enterprise Drive, and then to the entrance of Lake Compounce; (c) said 2.2 mile stretch of Route 229 is located in the Town of Southington; and, traffic problems on this roadway were first experienced by the Town during the 1988 concert season; heavy, stopped traffic is the "biggest problem", and some of the concerts are worse than others with respect to backed-up traffic; (d) when concerts are held, the Town assigns officers to operate the traffic lights along West Street, and additional officers are assigned to the parking lot of Lake Compounce; (e) at the entry hours, concert traffic backs up for several miles, occupants of cars often become unruly, residents of the area complain of patrons walking on lawns and discarding empty beverage containers from vehicles, residents along West Street are unable to exit their driveways, and the occupants of business establishments along West Street complain that customers cannot enter and exit parking areas; (f) traffic often backs up to about a mile south of the I-84 bridge; (g) officers encounter difficult problems operating the traffic signals on West Street; (h) emergency vehicles, particularly ambulances, police cars, and wreckers, have a difficult time getting through congested traffic; and, (i) access to officers on duty within the Park is greatly reduced and/or obstructed by the stopped, backed-up traffic. On cross-examination, the witness acknowledged that much of the information included in his testimony was presented previously to the STC, and the record established before that agency would so indicate.
Plaintiff also presented the testimony of its Town Planner concerning the zoning regulations and requirements which pertain, generally, to properties along Route 229/West Street from the I-84 interchange to the Bristol Town Line. According to this witness, Lake Compounce is "allowed by special exception in an R-80 zone — two acre, residential — by virtue of a special permit from the Planning and Zoning Commission." In the area of two and one-quarter miles surrounding Lake Compounce, there are approximately five hundred thirty-seven developable acres, sixty-seven of which are industrial, three business, and the remaining four hundred sixty-six residential. Along Route 229/West Street, north of I-84, and in that area of the Town generally, there exists some business and commercial zoning, but the "prevalent zoning" is residential -R-40 (1 acre) and R-80 (2 acre). The Town Planner further testified: (a) complaints have been received from residents and businesses regarding extreme traffic congestion; (b) planning and development is considering mixed land uses, i.e., residential and commercial, along this CT Page 861 stretch of West Street; (c) the traffic congestion will have a negative impact on "that type of zoning scheme;"(d) the traffic condition "depreciates the value of the homeowners along West Street;" (e) while the regulations require traffic service levels of at least c or better in zones requiring site plan approval, such levels have been reduced to D and E as a result of the concert traffic; (f) however, "in the residential single family areas, site plans are not required and traffic is not an issue"; (g) the existing traffic from concerts at the Park "impairs the reasonable use and enjoyment of residential properties" in the area because of the high traffic volume, stalled traffic conditions, and patron misbehavior while walking and waiting in traffic.
On the basis of the record and this additional testimony, plaintiff asserts it is an aggrieved party because: the issuance of Certificate 606-A effectuates reduced levels of service along Route 229; extreme traffic back-ups prevent, or at least substantially impede, the Town's ability to provide emergency police, fire, ambulance, and towing services; the traffic condition impacts negatively on commercial development in that compliance with existing regulations requires the maintenance of level C or better; and, residential and commercial properties have been "devalued" because of traffic congestion leading "to a decreased tax base for the Town of Southington", and impacting negatively on "future development."
c) Application of Two-Prong Test
Section 14-311(a) imposes upon the STC the responsibility of determining whether or not the proposed operation or development will "imperil the safety of the public." Under Subsection (d), the STC, in deciding whether to certify that the operation will not imperil public safety, must include in its consideration highway safety, the width and character of the highways, the density of the traffic thereon, and the character of such traffic. Section 14-311 does not provide for a public hearing on an application for such certification; however, here, on the issue of public safety, which is all that was before the STC on this application, members of the public were permitted to submit data and/or address the Commission. Thus, as defendants point out, the Town of Southington addressed the STC, and furnished information, with much the same rights and interests of any citizen, that is, a general interest in the safety of the state highway system affected by the proposed development. The first prong of the Nader v. Altermatt test requires that the litigant claiming aggrievement must demonstrate a specific, personal and legal interest distinguishable from a general interest, such as that embraced by all members of the community as a whole. All CT Page 862 members of the community, particularly those living, or occupying land, in the immediate vicinity of the particular state highway, are interested in the public safety of that highway system; however, that general interest alone is not the "specific, personal, and legal interest" necessary for aggrievement, permitting an appeal from a determination regarding public safety rendered by the STC. It would seem that an applicant denied certification under Section 14-311 would be an "aggrieved" party, having full standing to appeal the STC determination, based on a special, personal, and legal interest in the subject matter of the STC decision, distinguishable from the general interest of the members of the community. However, as stated, any citizen who simply presented information relating to highway safety to the STC would not, without more, have a "specific, personal and legal interest", as opposed to merely "a general interest", in the issue (public safety) which, under Section 14-311, is to be determined by the Commission. See: e.g. Connecticut Business Industries Assn., Inc. v. CHHC, 214 Conn. 726 (1990).
Plaintiff first argues an economic interest or consequence stemming from the issuance of Certificate 606-A; at trial, its counsel stated:
 "on the economic side, we have heard testimony from the Town Planner that there will certainly be an impact on commercial development; and particularly, if they have to comply with our existing regulations for maintaining level C services, and the Town's position also [is] that there is [a] devaluation [which] has occurred as to residential and commercial property already. This leads to a decreased tax base for the Town of Southington, and does not lend itself well for future development."
It appears to the court that many of the assertions regarding a devaluation of residential and commercial property, a decrease in the Town's tax base, and an adverse impact on "future development", are, aside from being questionable, prospective and quite speculative. cf. Sachem's Head Assn. v. Lufkin,168 Conn. 265, 367-68 (1975); Sheridan v. Planning Board, 159 Conn. 1,10-14 (1969) ("`Allegations and proof of mere generalizations and fears are not enough to establish aggrievement'"). The Town Planner testified that most of the zoning in the Compounce area is single family residential, and with respect to levels of traffic services, "traffic is not an issue" in the "prevalent" R-40 and R-80 zones. Regarding the traffic impact on the "mixed use zone" scheme under consideration along West Street, that CT Page 863 "plan of development . . . is not yet in place" ( as of the time of trial); therefore, the impact of the reductions to below level C on commercial and business development appears prospective and subject to present uncertainty. On the evidence presented, a devaluation of properties, and an adverse impact on commercial and business development, all claimed to result in a reduction of the Town's tax base, is viewed as conclusory, speculative, and somewhat devoid of any supporting basis or rationale. It is the court's view that this testimony did not demonstrate that any specific, personal and legal interest of the plaintiff had been specially and injuriously affected by the administrative action of the STC in issuing Certificate 606-A.
However, plaintiff, pointing to the testimony of its Chief of Police, further argues that its responsibility to provide emergency services is not a general interest akin to that of all members of the public, but is a special Town interest which is injuriously affected by the extreme traffic congestion on Route 229 at the times of the concerts. At trial, plaintiff's counsel stated:
 "Emergency services need to be provided, not only to Compounce, but to that part of town. And, there has been testimony today (Chief of Police) that such emergency services — fire, ambulance, towing, either have had problems, or will experience problems during heavily attended concerts."
In a sense, these are the concerns of every citizen; all persons have an interest in receiving adequate police, fire, etc., protection, and in seeing that the state highways in their particular town or area are fit for the effective and appropriate provision of such services. And, arguably, such a general interest in the proper rendition of emergency services would be insufficient to render every interested citizen an "aggrieved person" for purposes of standing to appeal a STC determination relating to highway safety. By way of example, in Connecticut Business Industries Assn., Inc. v. CHHC, supra at p. 731, it was stated:
 "The plaintiffs do not contend that aggrieved by an increase in hospital rates so that they would be entitled to appeal. The rate setting procedures designed by the legislature in establishing the prospective payment system for hospitals do not provide for public hearings before those rates are initially established by CHHC. The rates are determined entirely upon the basis of CT Page 864 the data submitted. . ."
Similarly, as stated, Section 14-311 does not provide for any public hearing, although on this application for a Certificate, the Town and interested citizens were permitted to submit data on the issue of public safety. But nevertheless, while the question of aggrievement here is a close one, the court views the Town of Southington's interest in fulfilling its responsibility to assure the adequate provision of emergency services to be a interest distinguishable from that of the citizenry as a whole. It is plaintiff's municipal responsibility to provide and maintain adequate and effective police, fire, and other emergency services. The fair import of the Police Chief's testimony was that during the arrival hours for the Compounce concerts, extreme traffic congestion on Route 229/West Street has rendered it extraordinarily difficult to get police cars, fire apparatus, ambulances, and other emergency vehicles quickly through the traffic back-ups. Thus, plaintiff has demonstrated that the Town's specific interest in fully meeting its responsibility of assuring the rendition of appropriate emergency services, which interest is distinguishable from the interest of the public generally, has been, or reasonably may be, "injuriously affected" by the administrative determination; therefore, plaintiff is an "aggrieved person" under the statute(s) authorizing Superior Court review.
d) Contested Case
Under Section 4-183, as applicable to this case, a litigant desiring to review an agency's decision must establish aggrievement resulting from "a final decision in a contested case." cf. Herman v. Division of Special Revenue, 193 Conn. 379,381 (1984) (Emphasis by Court); see also, General Statutes Section 4-183(a) (rev'd to 1989).[12] Therefore, there remains the significant question of whether plaintiff was "aggrieved" by an administrative determination arising out of a "contested case;" that is, whether proceedings conducted by the STC on an application for a Section 14-311 Certificate legally constitute a "contested case".
At the time of the Compounce application, the UAPA defined "Contested case" as meaning "a proceeding including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but does not include hearings referred to in section 4-168[.]" General Statutes Section 4-166 (2). (rev'd to 1989). In the Herman case, which was an appeal from a judgment sustaining CT Page 865 Special Revenue's denial of the plaintiff's request for reinstatement as a patron at a jai alai fronton, the Supreme Court considered the question of a statutory right to a hearing which would provide access to the courts through the appeal provisions of the UAPA; the Court stated:
 "The test for determining contested case status has been well established and requires inquiry into three criteria, to wit: (1) whether a legal right, duty or privilege is at issue; (2) and is statutorily required to be determined by the agency, (3) through an opportunity for hearing or in which a hearing is in fact held."
 Herman v. Division of Special Revenue, supra at p. 382 (citing Taylor v. Robinson, 171 Conn. 691, 697 (1976)).
In Herman, a hearing on reinstatement was actually held; however, the Court reasoned that since Special Revenue was not statutorily required to determine eligibility for reinstatement, the proceeding lacked the element of a "right to be heard" and, consequently, it was not a "contested case".
In Connecticut Business Industries Assn., Inc. v. CHHC, supra, the Supreme Court, as noted heretofore, observed that the rate setting procedures fixed by statute to establish the prospective payment system for hospitals did not provide for public hearings; the Supreme Court, holding that the plaintiff Associations were not "aggrieved" persons, left open the question of whether, if hearings had been held, and the plaintiffs had participated in them, status would have existed to appeal pursuant to Section 4-183(a). In the Herman case, the plaintiff had argued that a "contested case" was any proceeding in which a hearing was "in fact held"; 193 Conn. at 382; there, the Court held, however, that "[a]lthough the `reinstatement hearing' exhibited all the characteristic elements of a hearing in that evidence was presented, witnesses were heard, and testimony was taken in an adversarial setting", the proceeding was "gratuitous" in that the plaintiff had no "right to be heard" and, therefore, the proceeding did not qualify as a "hearing in fact held". The Superior Court decision in Connecticut Post Limited Partnership v. State Traffic Commission, 2 CSCR 677 (June 8, 1987) specifically addressed Section 14-311 and the "contested case" requirement of the UAPA. Connecticut Post was an action for a declaratory judgment and a temporary injunction in regard to an application for a Certificate of Operation under Section 14-311. The plaintiff, like Southington in the instant case, was not the applicant and CT Page 866 had brought the action seeking to determine its appeal rights upon the issuance of the Certificate. The court, in Connecticut Post, stated: "There is nothing in [Section] 14-311 that either directly, or indirectly, shows any legislative intent that a hearing be held" on an application for a Certificate. The Connecticut Post analysis continued, quite convincingly, as follows:
 "The administrative analysis and granting or denying of an application under . . . [Section] 14-311 do not necessarily create a `contested case' . . . Section 4-177 described what is required in a `contested case'. A reading of the seven subsections of that section alongside the five subsections of . . . [Section] 14-311 makes a strong case that a simple `application for a certificate' does not somehow become a contested case . . . Without at least a statutory expectation of a hearing `no contested case' can arise." (Emphasis added)
This court agrees with the reasoning of Connecticut Post that Section 14-311 grants no right to a hearing on an application for a Certificate and, therefore, there exists no "statutory expectation" of a hearing, particularly on the part of one other than the applicant.
Assuming that for purposes of Section 4-166(2) (defining "Contested case"), the STC, under Section 14-311, in granting or denying the application, determines "the legal rights, duties or privileges" of the applicant (in this case, Compounce), it nevertheless is the court's view that Section 14-311 provides no "right to be heard" (and no opportunity to be heard).[13] On the dispositive issue of whether a "hearing [was] in fact held", the record certainly indicates that the STC considered and discussed Compounce's application when the Commission met on April 18 and on May 4, 1989; and, that a number of interested persons were permitted to speak, and submit data, regarding the pending application. However, in Herman, our Supreme Court defined "hearing" as a "proceeding . . . in which . . . parties proceeded against have [a] right to be heard. . ." (Emphasis by court). 193 Conn. at 382-383. Thus, where there is no "right to be heard", and here there is none under Section 14-311 (especially so, respecting a non-applicant: Southington), there can be no "hearing . . . in fact held". Id at p. 387.
Plaintiff cites Rybinski v. State Employees' Retirement Commission, 173 Conn. 462 (1977), which involved an appeal to the Court of Common Pleas from the Retirement CT Page 867 Commission's denial of a state employee's request to change retirement plans. The Retirement Commission's decision to deny the employee's request was made "as a matter of routine business at a regular commission meeting solely upon written correspondence between the parties"; neither the employee nor her counsel appeared before the Commission. Common Pleas sustained the Commission's plea in abatement dismissing the appeal on the basis that because a hearing was neither required by statute nor in fact held, the proceeding did not involve a "contested case" within the meaning of the UAPA. In affirming the lower Court's sustaining of the plea-in-abatement, the Supreme Court emphasized that no hearing was in fact held: "Not only was there no statutory requirement that `an opportunity for a hearing' be provided, but, as the lower court reasonably concluded from the facts, no hearing was `in fact held' by the commission . . . a `hearing' had not in fact taken place under any reasonable definition of such a proceeding." Id. at p. 471-72.
The Rybinski holding referred to Taylor v. Robinson, supra, an appeal to the Supreme Court from a dismissal of a writ of habeas corpus brought by inmate denied parole on four occasions; the petitioner alleged that the procedures followed by the Board of Parole at release hearings did not comply with the requirements of the UAPA. The dispositive issue centered on whether parole proceedings constituted a "contested case" under the UAPA. The Supreme Court observed that a "parole release hearing obviously qualifies as a proceeding `in which a hearing is in fact held'". However, the Court upheld the dismissal of the writ on the basis that the parole statute did not require the Board to determine individual prisoner parole eligibility; the Taylor Court reasoned:
 "The parole situation . . . bears little resemblance to those cases in which we have held that the UAPA provisions concerning contested cases do apply; [Murphy v. Berlin Board of Education, 167 Conn. 268, 373 (1974); McDermott v. Commissioner of Children Youth Services, 168 Conn. 435 (1975)]; both involve hearing which were statutorily required to be held before dismissing a tenured teacher . . ." (Emphasis added) 171 Conn. at p. 698.
In the Herman case, where a gratuitous hearing had been provided, the Court, citing Rybinski, stated that for a proceeding to qualify as a "hearing" for purposes of Section 4-166(2), the party "must have a statutory or regulatory right to be heard by the agency." (Emphasis added). The Herman Court explained that Rybinski had not overruled the decision in Taylor, or, in any way altered the definition of a "contested CT Page 868 case". Thus, without a statutory right to, or an opportunity for, a hearing, or, at least, a statutory expectation of a hearing, the proceeding does not become a "contested case".
Assessing the instant case with reference to the foregoing authorities, it is concluded that where there is no "right to be heard," there can be no "hearing . . . in fact held". Section 14-311 does not provide a right to be heard (most particularly, to a non-applicant). Similarly, no STC regulation conferring a right to be heard on an application for a certificate. See: Conn. Agencies Regulations, Section 14-312-1
(effective March 26, 1981). While plaintiff has referred to Department of Transportation regulations, (Conn. Agency Regulations, Sections 13b-17-115 to 13B-17-139 (effective October 3, 1979)), those regulations merely address very specifically, and in a detailed manner, the procedure to be followed in contested cases, but are not determinative of whether a proceeding actually is a "contested case." The Section 14-311 procedures for issuing Certificates of Operation do not provide for public hearings and, as alluded to in the Connecticut Post decision, the statute certainly appears to contemplate an administrative decision rendered on the basis of written material and information supplied to the STC by the applicant.[14] See: e.g. Connecticut Business Industries Assn., Inc. v. CHHC, supra at p. 731 (hospital rate setting procedures do not provide for public hearings and rates are determined on the basis of data submitted by the applicant — "[s]uch a procedure does not constitute a `contested case'"). Simply Southington at its request, and Compounce, Southington, and others were allowed to address the Commission and submit written proceeding which was not statutorily required into a "hearing" UAPA. In the court's view, based on an analysis of the statutes opposing the issuance of a Certificate cannot create a "contested case" simply by appearing at the STC proceedings, and requirement for a public hearing, and such appearances are merely allowed gratuitously. As stated in Herman, ". . . lacking remained gratuitous and did not qualify as a `hearing in fact held' [;] [c]onsequently, there was no contested case . . ." under the UAPA definition.
General Statutes Section 14-311(e) authorizes an aggrieved person to appeal form the STC determination pursuant to Section 4-183 (UAPA). The latter provision permits an appeal by one who is aggrieved by a final decision in a contested case. For the reasons stated herein, the STC proceedings concerning the issuance of Certificate 606-A on May 4, 1989, and Executive Director's decision of August 14, 1989, did not satisfy the legal requirements of a "contested case".[15]
MULCAHY, J. CT Page 869
Footnotes